IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

KIRSTEN BOWMAN,                                     No. 3:16-cv-00267-HZ

                    Plaintiff,

         v.

CAROLYN W. COLVIN,                                  OPINION & ORDER
Acting Commissioner of Social Security,

                    Defendant.

George J. Wall
1336 E. Burnside Street, Suite 130
Portland, Oregon 97214

         Attorney for Plaintiff

Billy J. Williams
UNITED STATES ATTORNEY
District of Oregon
Janice E. Hebert
ASSISTANT UNITED STATES ATTORNEY
1000 S.W. Third Avenue, Suite 600
Portland, Oregon 97204-2902

/ / /

1 - OPINION & ORDER

Lisa Goldoftas
SPECIAL ASSISTANT UNITED STATES ATTORNEY
Office of the General Counsel
Social Security Administration
701 Fifth Avenue, Suite 2900 M/S 221A
Seattle, Washington 98104-3858

      Attorneys for Defendant

HERNANDEZ, District Judge:

      Plaintiff Kirsten Bowman brings this action seeking judicial review of the Commissioner's final decision to deny disability insurance benefits (DIB). This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). I affirm the Commissioner's finding on the issue of Plaintiff's credibility. However, I conclude that the ALJ erred in rejecting a portion of Plaintiff's treating physician's opinion. And, while I agree with the Commissioner that the ALJ did not improperly classify Plaintiff's prior receptionist position according to its least demanding function, I agree with Plaintiff that the receptionist position is inconsistent with the ALJ's residual functional capacity. Thus, I reverse the decision and remand for additional proceedings.

PROCEDURAL BACKGROUND

      Plaintiff applied for DIB on August 10, 2012, alleging an onset date of October 1, 2007. Tr. 453-54. Her application was denied initially and on reconsideration. Tr. 323-35, 351-53 (Initial); Tr. 336-50, 355-58 (Reconsideration). On April 11, 2014, Plaintiff appeared, with counsel, for a hearing before an Administrative Law Judge (ALJ). Tr. 65-114.[1] On July 2, 2014, the ALJ found Plaintiff not disabled. Tr. 43-64. The Appeals Council denied review. Tr. 1-7.

/ / /

---

    [1] The hearing transcript erroneously states that the hearing was held April 11, 2016. The ALJ's decision, issued July 2, 2014, provides the correct date of April 11, 2014. Tr. 46.

2 - OPINION & ORDER

## FACTUAL BACKGROUND

Plaintiff alleges disability based on having unspecified problems with her "joints," being partially blind, vertigo, Type 1 diabetes, anxiety, unspecified pain, right hip birth defect, hand and foot neuropathy, "multiple yearly infections," "adult onset ADD," and migraines.  Tr. 477. At the time of the hearing, she was thirty-seven years old.  Tr. 69.  She completed some college courses, but did not obtain a degree.  Tr. 69-70.  She has past relevant work experience as a salesperson, sales agent, program director, receptionist, and physical therapy aide.  Tr. 104-05.

## SEQUENTIAL DISABILITY EVALUATION

A claimant is disabled if unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]"  42 U.S.C. §§ 423(d)(1)(A), 1382c(3)(a).

Disability claims are evaluated according to a five-step procedure.  See Valentine v. Comm'r, 574 F.3d 685, 689 (9th Cir. 2009) (in social security cases, agency uses five-step procedure to determine disability).   The claimant bears the ultimate burden of proving disability. Id.

In the first step, the Commissioner determines whether a claimant is engaged in "substantial gainful activity."  If so, the claimant is not disabled.  Bowen v. Yuckert, 482 U.S. 137, 140 (1987); 20 C.F.R. §§ 404.1520(b), 416.920(b).  In step two, the Commissioner determines whether the claimant has a "medically severe impairment or combination of impairments."  Yuckert, 482 U.S. at 140-41; 20 C.F.R. §§ 404.1520(c), 416.920(c).  If not, the claimant is not disabled.

3 - OPINION & ORDER

In step three, the Commissioner determines whether plaintiff's impairments, singly or in combination, meet or equal "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." Yuckert, 482 U.S. at 141; 20 C.F.R. §§ 404.1520(d), 416.920(d). If so, the claimant is conclusively presumed disabled; if not, the Commissioner proceeds to step four. Yuckert, 482 U.S. at 141.

In step four, the Commissioner determines whether the claimant, despite any impairment(s), has the residual functional capacity (RFC) to perform "past relevant work." 20 C.F.R. §§ 404.1520(e), 416.920(e). If the claimant can, the claimant is not disabled. If the claimant cannot perform past relevant work, the burden shifts to the Commissioner. In step five, the Commissioner must establish that the claimant can perform other work. Yuckert, 482 U.S. at 141-42; 20 C.F.R. §§ 404.1520(e) & (f), 416.920(e) & (f). If the Commissioner meets his burden and proves that the claimant is able to perform other work which exists in the national economy, the claimant is not disabled. 20 C.F.R. §§ 404.1566, 416.966.

## THE ALJ'S DECISION

At step one, the ALJ determined that Plaintiff last met the insured states requirements on March 31, 2013 and had not engaged in substantial gainful activity since her alleged onset date through her date of last insured. Tr. 48. Next, at step two, the ALJ determined that Plaintiff has severe impairments of diabetes mellitus, carpal tunnel syndrome, neuropathy, ligament injuries to her shoulder and hip, attention deficit disorder, and retinopathy. Id. However, at step three, he concluded that her impairments did not meet or equal, either singly or in combination, a listed impairment. Tr. 49-50.

At step four, the ALJ concluded that Plaintiff has the RFC to perform light work as

defined in 20 C.F.R. § 404.1567(b), except she can perform frequent reaching, handling, and fingering; she can occasionally balance, crawl, and climb ramps and stairs; she can frequently stoop, kneel, and crouch, but she cannot climb ladders, ropes, or scaffolds. Tr. 50. She should avoid concentrated exposure to extreme cold, extreme heat, wetness, humidity, fumes, odors, dust, gasses, poor ventilation, and hazards. Id. She can perform simple and detailed tasks, but cannot perform complex tasks. Id. Her vision should be sufficient to perform a wide variety of tasks including work requiring occasional reading. Id. However, jobs requiring very fine vision, (such as bead work or work with thread) or prolonged visual work could be problematic. Id.

With this RFC, the ALJ determined that Plaintiff is able to perform her past relevant work as a receptionist. Tr. 57-58. The ALJ did not reach step five, but based on his step four finding, the ALJ determined that Plaintiff is not disabled. Tr. 58.

STANDARD OF REVIEW

A court may set aside the Commissioner's denial of benefits only when the Commissioner's findings are based on legal error or are not supported by substantial evidence in the record as a whole. Vasquez v. Astrue, 572 F.3d 586, 591 (9th Cir. 2009). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Id. (internal quotation marks omitted). The court considers the record as a whole, including both the evidence that supports and detracts from the Commissioner's decision. Id.; Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007). "Where the evidence is susceptible to more than one rational interpretation, the ALJ's decision must be affirmed." Vasquez, 572 F.3d at 591 (internal quotation marks and brackets omitted); see also Massachi v. Astrue, 486 F.3d 1149,

1152 (9th Cir. 2007) ("Where the evidence as a whole can support either a grant or a denial, [the

court] may not substitute [its] judgment for the ALJ's") (internal quotation marks omitted).

DISCUSSION

Plaintiff contends that the ALJ erred by (1) finding her subjective testimony not credible;

(2) rejecting the opinion of her treating physician; (3) classifying her past relevant work by its

least demanding function; and (4) concluding that the receptionist position is consistent with the

ALJ's RFC.

I.  Credibility

The ALJ is responsible for determining credibility.  Vasquez, 572 F.3d at 586.  Once a

claimant shows an underlying impairment and a causal relationship between the impairment and

some level of symptoms, clear and convincing reasons are needed to reject a claimant's testimony

if there is no evidence of malingering.  Carmickle v. Comm'r, 533 F.3d 1155, 1160 (9th Cir.

2008) (absent affirmative evidence that the plaintiff is malingering, "where the record includes

objective medical evidence establishing that the claimant suffers from an impairment that could

reasonably produce the symptoms of which he complains, an adverse credibility finding must be

based on 'clear and convincing reasons'"); see also Molina v. Astrue, 674 F.3d 1104, 1112 (9th

Cir. 2012) (ALJ engages in two-step analysis to determine credibility:  First, the ALJ determines

whether there is "objective medical evidence of an underlying impairment which could

reasonably be expected to produce the pain or other symptoms alleged"; and second, if the

claimant has presented such evidence, and there is no evidence of malingering, then the ALJ

must give "specific, clear and convincing reasons in order to reject the claimant's testimony about

the severity of the symptoms.") (internal quotation marks omitted).

When determining the credibility of a plaintiff's complaints of pain or other limitations, the ALJ may properly consider several factors, including the plaintiff's daily activities, inconsistencies in testimony, effectiveness or adverse side effects of any pain medication, and relevant character evidence.  Orteza v. Shalala, 50 F.3d 748, 750 (9th Cir. 1995).  The ALJ may also consider the ability to perform household chores, the lack of any side effects from prescribed medications, and the unexplained absence of treatment for excessive pain.  Id.; see also Tommasetti v. Astrue, 533 F.3d 1035, 1039 (9th Cir. 2008) ("The ALJ may consider many factors in weighing a claimant's credibility, including (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities.") (internal quotation marks omitted).

As the Ninth Circuit explained in Molina;

> In evaluating the claimant's testimony, the ALJ may use ordinary techniques of credibility evaluation.  For instance, the ALJ may consider inconsistencies either in the claimant's testimony or between the testimony and the claimant's conduct, unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment, and whether the claimant engages in daily activities inconsistent with the alleged symptoms[.]  While a claimant need not vegetate in a dark room in order to be eligible for benefits, the ALJ may discredit a claimant's testimony when the claimant reports participation in everyday activities indicating capacities that are transferable to a work setting[.]  Even where those activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment.

Molina, 674 F.3d at 1112-13 (citations and internal quotation marks omitted).

The ALJ followed the required two-step process, finding that Plaintiff's impairments

could possibly cause some of her alleged symptoms but that her statements concerning the intensity, persistence, and limiting effects of her symptoms were not entirely credible. Tr. 50-51. The ALJ gave several reasons in support of his credibility determination: (1) Plaintiff's allegations were not supported by the objective medical evidence; (2) Plaintiff had received essentially conservative treatment since her alleged onset date; (3) Plaintiff's impairments have remained stable; (4) Plaintiff was noncompliant with some of her treatment recommendations; (5) Plaintiff was laid off from her last job due to the economy; and (6) Plaintiff's activities were inconsistent with her allegations of disabling pain. Tr. 51-55.

Plaintiff argues that the record does not support the ALJ's findings that her treatment was conservative, that stable treatment equals non-disabling conditions, and that her activities are inconsistent with her allegations. Plaintiff does not take issue with the ALJ's determination that she was laid off from her last job because of a downturn in the economy which the ALJ took as an indication that her reported inability to work was not related to her impairments. Tr. 56. And, other than challenging the ALJ's determinations regarding conservative treatment and stable conditions, Plaintiff does not expressly challenge the ALJ's overall finding that her allegations are not supported by the objective medical evidence.

A. Conservative Treatment

The ALJ found that the record showed that Plaintiff has "received essentially conservative treatment since the alleged onset date of disability" of October 1, 2007. Tr. 51. Over the next several pages of his decision, the ALJ discussed Plaintiff's hip, shoulder, and hand impairments, her vision impairment, her diabetes, and her mental health impairments. Tr. 51-55. As to her hip, the ALJ discussed Plaintiff's history of hip impairments, including surgeries to her

right hip in 2001 and January 2007.  Tr. 52.  He noted that following the January 2007 surgery which was to lengthen her right hip iliopsoas, Plaintiff reported that the surgery had helped considerably and she was doing better.  Id.  The ALJ explained that treatment records did not show a significant worsening of her hip condition at or near the alleged onset date.  Id.  She continued to take pain medication by using a Fentanyl patch and reported to her pain management physician that her pain was well controlled at most times.  Tr. 52.  Later records showed no significant change in her condition.  In August 2010, she reported that she was quite stable in terms of her chronic right hip pain.  Id.

The ALJ also discussed Plaintiff's history of carpal tunnel symptoms.  Tr. 52-53.  She underwent a right carpal tunnel release about the time of the alleged onset date.  Tr. 52. Although she initially experienced a post-operative infection, by December 2007 there was no evidence of infection and she reported that the numbness in her index finger and middle finger were almost gone.  Tr. 52.  She had a left carpal tunnel release in October 2008.  Tr. 53.  X-rays of both hands and wrists in November 2008 were unremarkable.  Id.  Plaintiff complained of continued right hand symptoms in 2010.  Id.  Examination in May 2010 showed triggering of the right ring finger but Phalen's sign and Tinel's sign were negative bilaterally.  Id.  An early, mild Dupuytren's contracture was also noted.  Id.  Repeat carpal tunnel release on the right was recommended, but it has not been performed.  Id.

Plaintiff underwent eye surgery in late 2004.  Tr. 54.  In April 2005 the visual acuity in her right eye measured 20/200 and in the left it was 20/20.  Id.  Post-surgery, her right eye had not regained as much visual function because of diabetic capillary dropout temporal to the fovea, but her left eye continued to function well with little retinopathy.  Id.  She had a change in

peripheral field secondary to diabetic neuropathy. Id. By April 2012, no retinopathy or edema was noted. Id. Her best corrected vision was 20/100 in the right eye and 20/-20 in the left. Id. By 2013, she no longer was regularly seeing the eye doctor. Id.

Plaintiff uses an insulin pump to help manage her Type 1 diabetes. Tr. 54. The ALJ noted her treatment of the disease and concluded that although her diabetes has been uncontrolled, it has not resulted in significant symptoms as evidenced by records showing full strength, no edema, and intact sensation. Tr. 55. Additionally, the ALJ noted that the record showed that she was able to work despite her diabetes for many years. Id.

Plaintiff argues that the ALJ's conclusion that her treatment has been conservative, is "false." Pl.'s Brief 11. She notes that she has undergone multiple surgeries to treat her impairments, including carpal tunnel surgery, hip surgeries, and retinal tear correction. Additionally, she uses an insulin pump and checks her blood sugar level several times per day. Plaintiff contends that contrary to the ALJ's finding, she has undertaken a massive amount of treatment, which has been costly, painful, and time-consuming, "just to be as functional as she is." Id.

Plaintiff's argument fails to account for the ALJ's finding that her treatment has been conservative "since the alleged onset date of disability[.]" Tr. 51. As Defendant notes, the only surgical procedure she underwent after the alleged onset date of October 1, 2007 was a left carpal tunnel release in October 2008. The surgery was successful. While she has complained of right-hand symptoms since the alleged onset date, she has not had another surgery on the right wrist. In May 2011, she complained of pain in her hands, and an inability to pull clothes off a rack, but she failed to follow through with recommended occupational therapy. Tr. 570-73.

10 - OPINION & ORDER

She has had no eye surgery or hip surgery after her alleged onset date.  She treats the hip

pain with medication which she has repeatedly reported as controlled.  <u>E.g.</u>, Tr. 661 (Sept. 30,

2012 chart note noting history of hip pain; recent orthopedic opinion did not believe surgical

correction was an option; patient reported currently controlling pain with Fentanyl); Tr. 576 (Apr.

12, 2011 chart note reporting stable on dose of Fentanyl with pain at 3/10 but still having trouble

with prolonged walking); Tr. 583 (Aug. 2, 2010 chart note indicating Plaintiff was "quite stable"

in regard to her chronic hip pain for which she uses Fentanyl).  She obtained 20/-20 (left) and

20/100 (right) corrected vision since her retinal surgery which has apparently remained stable.

While she experiences vertigo, she reported successful treatment with a scopolamine patch.  Tr.

661 (Sept. 30, 2012 chart note remarking on history of recurrent vertigo which was controlled

with scopolamine).

Overall, the record supports the ALJ's conclusion that for several of her impairments, her

treatment since her alleged onset date has been fairly conservative.  The ALJ did not err in this

finding.

### B.  Stability of Impairments

The ALJ found that Plaintiff's conditions have "remained stable with medications."  Tr.

51.  As noted above, she has controlled her hip pain with Fentanyl.  As to the carpal tunnel

syndrome, the ALJ examined several medical records and concluded that they reflected

essentially unchanged objective findings.  Tr. 53.  He noted that she had not followed treatment

recommendations for occupational hand therapy, which he found detracted from the reliability of

her allegations.  Tr. 54.  And, as noted above, Plaintiff reported that the scopalomine addressed

her vertigo, although she limited her reading and computer usage to further control her vertigo

symptoms. Tr. 484. The ALJ also found that her mental health impairments had remained stable with medication. Tr. 55.

Plaintiff argues that the ALJ erred. She agrees she is stable on her medications. Pl.'s Brief 11. But, she argues that "'stable' does not mean well[.]" Id. Her medications treat her impairments but do not cure them. They are stable and unchanging, but that does not mean they are non-disabling.

The law allows an ALJ to consider the effectiveness of treatment as a factor in determining the severity of Plaintiff's symptoms. 20 C.F.R. § 404.1529(c) (3) (in assessing a claimant's credibility, the ALJ may consider "the type, dosage, effectiveness, and side effects of any medication"); Soc. Sec. Ruling (SSR) 96-7p, available at 1996 WL 374186, at *3 (among other factors, ALJ may consider the "type, dosage, effectiveness, and side effects of any medication the individual takes" as well as "[t]reatment, other than medication, the individual receives or has received for relief of pain or other symptoms"); Orteza, 50 F.3d at 750 (ALJ may consider effectiveness of pain medication in assessing claimant's credibility); Franz v. Colvin, 91 F. Supp. 3d 1200, 1207 (D. Or. 2015) (ALJ may consider effectiveness of pain medication in assessing credibility) (citing Ghanim v. Colvin, 763 F.3d 1154, 1163 (9th Cir. 2014); Tommasetti, 533 F.3d at 1039). While Plaintiff suffers from various chronic conditions, the record supports the ALJ's finding that they were well-controlled by medication and she has had few changed objective findings since her alleged onset date. As a result, the ALJ did not err in finding that several of her conditions were controlled by medication.

C. Compliance with Treatment Recommendations

As noted already, the ALJ correctly found that Plaintiff did not follow through on

recommendations for hand therapy. The ALJ also discussed Plaintiff's management of her diabetes. Tr. 54-55. The ALJ recognized that Plaintiff's diabetes had been uncontrolled. Tr. 55. But, he noted that the record showed she had not been compliant with treatment recommendations because she frequently changed her insulin on her own and failed to follow advice regarding lifestyle modifications. Tr. 55 (citing Tr. 881 (Dec. 24, 2012 endocrinology chart note stating "[s]he is constantly changing her dose on her own"; further noting that Plaintiff reported she was trying to eat properly but was getting little or no exercise)); see also Tr. 868 (Nov. 18, 2013 endocrinology chart note reporting same re: constantly changing dose on her own); Tr. 870 (Sept. 23, 2013 endocrinology chart note reporting same).

Plaintiff argues that the record does not show that any doctor has accused her of failing to treat her diabetes. She asserts that Type 1 diabetes is extremely difficult to control and that she spends a good deal of time every day trying to control the disease because if she does not, it will blind, cripple, and ultimately kill her. She contends that due to diabetes, she has recurring infections, progressive neuropathy in her hands and feet, and partial blindness. Thus, she argues, that ALJ's assertion that she does not have serious effects from diabetes or that she does not comply with her doctors' advice, is contrary to the record.

Plaintiff is correct that no physician has expressly stated that she has failed to treat her diabetes. But, at the same time, the record supports the ALJ's finding that she adjusts her insulin dose on her own and has not always followed recommended lifestyle changes. And, while she has had effects from the diabetes, the record shows, as the ALJ noted, that they are either not as serious as she claimed or have been fairly well managed with treatment. E.g. Tr. 54 (ALJ cited to endocrinology records showing that her feet were "in good repair" and she had good strength,

13 - OPINION & ORDER

no edema, and intact sensation); Tr. 876-88 (Apr. 1, 2013 endocrinology chart note reporting that

Plaintiff's "feet are in good repair"; no sores, callouses, or corns in her feet; good muscular

strength; no edema in her extremities; intact vibration at the great toes); see also Tr. 880 (Dec.

24, 2012 endocrinology chart note stating that her feet are in good repair); Tr. 633 (2012

endocrinology chart note stating that her feet are in good repair, she had good strength, no edema

in her extremities, no sores, callouses, or corns on her feet, and that she had intact vibration at the

toes).

Moreover, as Defendant suggests, Plaintiff's efforts at controlling her diabetes "aligns"

with the ALJ's observation that Plaintiff has managed her diabetes for many years. The ALJ

found that Plaintiff had worked despite her diabetes for many years, undermining her allegation

that it prevented her from working. Plaintiff does not challenge that assertion. The ALJ's finding

that the record does not support debilitating, disabling diabetes is supported by the record.

D.  Activities of Daily Living

The ALJ found that Plaintiff's activities of daily living were a basis to discount her

disabling allegations. Tr. 55-56. He noted that although she alleged her conditions were so

severe that she is unable to work, her activities suggested greater functioning. Tr. 55. First, he

cited to evidence that Plaintiff was the primary caregiver of her two children, currently ages nine

and eleven. Id. (also noting that one child was a toddler at the alleged onset date). She cared for

them in various ways, including providing personal care such as brushing their hair and teeth,

and transported them to and from school. Id. Next, he cited to Plaintiff's description of how she

spent a typical day: she got up, helped get her children ready for school, drove them to school,

returned home, and slept for awhile. Id. She might go to some thrift stores but returned home in

time for her children to get home from school.  Id.  She picked up the mail and cooked dinner.

Id.  She watched some television and used the computer occasionally.  Id.  At one point, she said

she cooked full course meals for her family and enjoyed doing so.  Tr. 55-56.

The ALJ also cited to Plaintiff's activity of "promoting her husband's wallet business,"

and her own work activity after the alleged onset date.  Tr. 56.  The ALJ described Plaintiff's

September 2011 report that her job was "vintage clothing."  Tr. 56 (citing Tr. 570).  At the

hearing, she described that she would shop at thrift stores and buy vintage clothing, then try to

resell it.  Tr. 96.  The ALJ acknowledged Plaintiff's testimony that the work was not significant.

Tr. 56.  But, he explained, "the fact that she continued to perform some work activity is

inconsistent with her allegation of disability."  Id.  He concluded that her activities were not

consistent with the extent of her alleged symptoms and limitations and rendered her reports less

credible.  Id.

Plaintiff argues that the ALJ erred.  She focuses only on the ALJ's reliance on her part-

time work.  Pl.'s Brief 12.  She argues that a person who can perform part-time work, but not

full-time work, is disabled under the Act and thus, her effort to make some money despite her

physical limitations is not inconsistent with her allegations that she is disabled.  Rather, her effort

is a "testament to her resourcefulness and her desire to work."  Id.

As stated above, an ALJ may consider a claimant's daily activities in assessing a

claimant's credibility.  E.g., Tommasetti, 533 F.3d at 1039.  "[T]he ALJ may reject a claimant's

symptom testimony if the claimant is able to spend a substantial part of her day performing

household chores or other activities that are transferable to a work setting."  Smolen v. Chater, 80

F.3d 1273, 1284 n.7 (9th Cir. 1996) (citing Fair, 885 F.2d 597, 603 (9th Cir. 1989)).  Even if the

activities do not constitute substantial gainful activity in and of themselves, they may still contradict allegations of disabling limitations.  Molina, 674 F.3d at 1113.

The ALJ cited to a number of activities that Plaintiff performed, including part-time work selling vintage clothing which involved searching for clothing in thrift stores and then reselling it.  The ALJ also cited to Plaintiff's helping her husband promote his business, and various household chores including being the primary caregiver of her children.  While the law does not require her to be "utterly incapacitated" to be disabled under the Act, Smolen, 80 F.3d at 1284 n.7, the ALJ's interpretation of those activities as being inconsistent with her subjective limitations testimony was not unreasonable and was supported by the record.

The ALJ gave several, valid reasons in support of his credibility determination.  These reasons were supported by substantial evidence in the record.  The ALJ did not err in concluding that Plaintiff's subjective limitations testimony was not entirely credible.

II.  Treating Physician Opinion

Plaintiff began treating with Kevin Carpenter, M.D., as a primary care physician, in February 2012.  Tr. 556-59.   On February 11, 2014, Dr. Carpenter completed a Physical Capacity Statement and provided a letter discussing Plaintiff's conditions and limitations.  Tr. 886-90.  In the letter, Dr. Carpenter stated that Plaintiff's "disabling conditions" include chronic hip pain, carpal tunnel, fatigue, and Type 1 Diabetes Mellitus, which has resulted in neuropathy in her hands and feet as well as blindness in her right eye, headaches, and vertigo.  Tr. 886.  Dr. Carpenter stated that the hand neuropathy, combined with Plaintiff's carpal tunnel syndrome, causes pain in her hands as well as a tendency to drop things, creating limitations in handling, gripping, and fingering to no more than occasionally, which he defined as up to one-third of an

eight-hour work day.  Id.

He explained that diabetes had contributed to Plaintiff's blindness and that due to her

vision problems, she should not read, look at a computer screen, or do other tasks requiring close

vision.  Id.  Any of those activities should be followed by a break of at least twenty minutes to

rest her eyes.  Id.  She sometimes suffers from headaches and vertigo which may be related to her

poor vision.  Id.  Dr. Carpenter opined that she would more than likely need to take unscheduled

breaks to lie down and rest in addition to morning, lunch, and afternoon breaks.  Id.

Finally, he noted her long history of hip pain which limited her ambulation.  Id.  He

recommended she walk with a cane and noted that she had been issued a disabled parking pass.

Id.  He stated that the combination of diabetic neuropathy in her feet, left knee pain, and hip pain

would more than likely limit her combined standing and walking to no more than two hours in an

eight-hour day, and then only if she could change position from sitting to standing at will.  Id.

In the Physical Capacity Statement, Dr. Carpenter opined that Plaintiff could walk two

city blocks without increased symptoms or a need to rest, could sit and stand/walk for a total of

two hours in an eight-hour day, and that she would need to alternate positions up to thirty

minutes before sitting again.  Tr. 887-88.  Dr. Carpenter checked boxes indicating that Plaintiff

would be limited in a variety of physical activities, including being completely unable to squat,

crawl, repetitively grasp, repetitively push/pull with hands, or crouch.  Tr. 889.  He limited her to

occasional lifting and carrying of less than ten pounds.  Id.  He opined Plaintiff would have "bad

days" during the month when it would be expected that her physical condition would likely make

her absent from work.  Id.

The ALJ gave Dr. Carpenter's opinion "minimal weight."  Tr. 56.  First, the ALJ found

that his opinion was not consistent with the objective findings in his own treatment records, or the treatment records of others. Id. Second, he found that Plaintiff's activities suggested greater capabilities that indicated by Dr. Carpenter. Tr. 57. As a result of these findings, he concluded that Dr. Carpenter's opinion was not well supported or consistent with the record. Id.

Social security law recognizes three types of physicians: (1) treating, (2) examining, and (3) nonexamining. Holohan v. Massanari, 246 F.3d 1195, 1201-02 (9th Cir. 2001); Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1996). Generally, more weight is given to the opinion of a treating physician than to the opinion of those who do not actually treat the claimant. Id.; 20 C.F.R. § 404.1527(c)(1)-(2).

If the treating physician's medical opinion is supported by medically acceptable diagnostic techniques and is not inconsistent with other substantial evidence in the record, the treating physician's opinion is given controlling weight. Orn v. Astrue, 495 F.3d 625, 631 (9th Cir. 2007); Holohan, 246 F.3d at 1202. If a treating physician's opinion is not given "controlling weight" because it is not "well-supported" or because it is inconsistent with other substantial evidence in the record, the ALJ must still articulate the relevant weight to be given to the opinion under the factors provided for in 20 C.F.R. § 404.1527(c)(2). Orn, 495 F.3d at 631.

If the treating physician's opinion is contradicted by another doctor, the ALJ may not reject the treating physician's opinion without providing "specific and legitimate reasons" which are supported by substantial evidence in the record. Id. at 632.

Plaintiff argues that the ALJ erred in rejecting Dr. Carpenter's opinion because the reasons given were not legitimate. She contends that contrary to the ALJ's finding, Dr. Carpenter's opinion is supported by the objective medical record and further, the record disproves

the ALJ's assertion that Plaintiff's daily activities exceed Dr. Carpenter's limitations.

A. Objective Medical Evidence

In discussing what the ALJ found to be a lack of objective medical evidence in support of Dr. Carpenter's opinion, the ALJ first rejected the limitations on standing and walking. Tr. 56-57. The ALJ noted that Plaintiff consistently reported that her hip pain was controlled with Fentanyl and there was no evidence of significant diabetic neuropathy in the feet as evidenced by the endocrinology records consistently noting that her feet were in good repair with intact sensation through the date last insured. Tr. 56. Additionally, Plaintiff did not consistently report knee pain and imaging was normal. Id. Thus, the ALJ concluded, the extent of Dr. Carpenter's standing and walking limitations were not consistent with the record.

Plaintiff argues that the objective evidence shows that her diabetes has caused neuropathy, she has had multiple surgeries on her hip, and in September 2012, Dr. Carpenter approved a disabled parking sticker for her because her hip impairment limited her ability to walk. However, she does not point to evidence in the record supporting a diagnosis of diabetic neuropathy in her feet. As noted above, several records from her endocrinologist Dr. Gerald Youker show that her feet "were in good repair" and she had intact vibration. And, as previously discussed, while she has had hip surgeries before her alleged onset date, she has repeatedly reported that her pain is well-controlled on Fentanyl. Although she reported to Dr. Carpenter in September 2012 that her hip condition limited her ambulation, she also reported at the same visit that she was currently controlling the pain with Fentanyl. Tr. 661. As to the knee pain, Plaintiff does not challenge the ALJ's finding that she did not consistently report knee pain or that the imaging studies were normal.

The ALJ's rejection of Dr. Carpenter's standing and walking restrictions is supported by substantial evidence in the record.  The objective medical record fails to establish that Plaintiff has neuropathy in her feet or restrictions because of her knee.  As to her hip, while she has complained at times of problems ambulating, she has repeatedly stated her pain is controlled with Fentanyl.  Given that, the ALJ did not err in concluding that Dr. Carpenter's standing and walking restrictions were inconsistent with the objective medical evidence.

Next, the ALJ discussed Dr. Carpenter's hand-related restrictions.  Tr. 57.  The ALJ stated that the record contained few notations regarding Plaintiff's difficulty using her hands aside from her 2011 report that her job was "vintage clothing" and she was having difficulty pulling clothes off the rack.  Tr. 57.  The ALJ found that the record did not reveal consistent reports of, or contain findings corroborating, a "tendency to drop things" that would result in significant manipulative limitations.  Id.

Plaintiff notes that the record establishes that she had carpal tunnel surgery on both wrists and that a June 2010 examination revealed recurrent carpal tunnel syndrome on the right.  That same examination noted the presence of a mild, early Dupuytren's contracture as well as a symptomatic right ring trigger finger.  Tr. 1207.  Plaintiff argues that this is objective evidence of impairments which supports her tendency to drop things.

The ALJ was correct that the record does not show repeated complaints by Plaintiff that she was "dropping things."  But, Dr. Carpenter's restrictions on handling, fingering, and gripping were based on a combination of her neuropathy and carpal tunnel symptoms which he opined caused both pain and the tendency to drop things.  The ALJ's rejection of this portion of Dr. Carpenter's opinion is based only on a lack of objective evidence regarding her tendency to drop

things.  The ALJ's rationale does not address the effects of pain.  Plaintiff is correct that the

objective findings of continued carpal tunnel syndrome in the right hand, the trigger finger, and

the Dupuytren's contracture provide some objective basis for some of Dr. Carpenter's limitations.

E.g., Tr. 1207 (June 2010 chart notes showing recurrent carpal tunnel on the right, trigger finger,

Dupuytren's contracture); Tr. 1199 (March 2010 chart note by neurologist Tracy Sax, M.D.,

noting examination results showing decreased sensation in right hand and forearm).  And, while

the reports of neuropathy in her hands are not extensive, there are some.  E.g., Tr. 1206-07 (May

and June 2010 chart notes by specialist regarding carpal tunnel syndrome noting her peripheral

neuropathy).

However, given that the recurrent carpal tunnel syndrome is limited to the right hand, as

is the trigger finger and Dupuytren's contracture, and given the specialist's observation that her

peripheral neuropathy was not affecting the left hand, Tr. 1207, the ALJ's finding was correct as

to bilateral hand-related restrictions.  Given that the objective record suggests a basis for some

restrictions in the right hand, the ALJ's rejection of right-handed manipulative restrictions is not

supported by substantial evidence in the record.

As to her visual functioning, the ALJ noted that Plaintiff's vertigo was well-controlled

with scopalomine.  He found that Dr. Carpenter's visual limitations were not consistent with the

most recent ophthalmology records showing 20/100 corrected visual acuity in one eye and 20/-20

in the other or with the fact that Plaintiff has not required ongoing treatment for her visual

condition.  Tr.  57.  Plaintiff argues that the ALJ erred in this conclusion because the record

establishes that as a result of her partially detached retina in 2004, she achieved only 20/100

visual acuity in the right eye, which is permanent.  Tr. 676.  She notes that post-operatively in

21 - OPINION & ORDER

2005, her eye doctor noted her difficulty reading fine print, inability to see street signs while driving in the daytime, and inability to drive at night.  Id.  He also noted that Plaintiff experienced headaches after three to five minutes of reading fine print.  Id.  And, she states, she currently limits her driving to daytime only.  Tr. 484.  She also does not use a computer for longer than twenty to forty minutes or read books because she experiences "full on room spinning vertigo."  Id.

The ALJ's rejection of Dr. Carpenter's opinion is supported in part.  The record shows that Plaintiff's vertigo is well-controlled on scopalomine.  But, that is not necessarily inconsistent with Dr. Carpenter's opinion that she "sometimes" suffers from headaches and vertigo.  Furthermore, the record shows that while her visual acuity is stable, the effects of her retinal tear and surgery are permanent and thus, the notation by her eye surgeon that her condition has caused difficulty reading fine print supports Dr. Carpenter's limitation regarding tasks requiring close vision.  What is less clear, however, is the basis for Dr. Carpenter's opinion for the need to take breaks following "close vision" tasks or the need to take unscheduled breaks to lie down.  While the record supports a limitation regarding close vision tasks and some limitation that addresses the occasional vertigo episode, the record does not reveal a need to rest her eyes or lie down with any frequency.  Thus, the ALJ's rationale for rejecting Dr. Carpenter's opinion regarding the need to rest her eyes or lie down is supported; the rationale for rejecting Dr. Carpenter's limitations regarding reading, using a computer, and other "close vision" tasks is not supported by substantial evidence in the record.[2]

---

[2]  The ALJ's RFC precludes jobs requiring prolonged visual work or requiring "very fine vision."  With those limitations, the RFC could possibly incorporate some of Dr. Carpenter's visual limitations.  But because the ALJ's RFC does not address the use of a computer and

B.  Inconsistent Activities

The ALJ also based his rejection of Dr. Carpenter's assessment on what he believed to be inconsistent activities by Plaintiff.  This basis was limited to activities the ALJ determined were inconsistent with Dr. Carpenter's manipulative and visual limitations.  The ALJ specifically noted Plaintiff's ability to cook "full meals" and computer use as suggestive of greater manipulative abilities.  Tr. 57.  He also cited to her driving, cooking, watching television, and computer use as inconsistent with Dr. Carpenter's visual restrictions.  Id.

Plaintiff argues that the record does not support the ALJ's finding.  As noted above, Dr. Carpenter opined that Plaintiff would be limited to no more than occasional handling, gripping, and fingering.  Plaintiff testified that she cooks meals and uses the computer on a limited basis.  While the ability to cook meals might be inconsistent with the allegation that she drops things, it is not necessarily inconsistent with Dr. Carpenter's opinion that she could occasionally handle, grip, and finger.  As noted above, Dr. Carpenter's manipulative restrictions are supported by the record to the extent they address limitations with the right hand.  Her activities of cooking and limited computer use are not inconsistent with a restriction allowing for occasional use of the right hand with full-function of the left hand.  To the extent the ALJ relied on her activities to reject all of Dr. Carpenter's manipulative restrictions, the ALJ erred.

As to her visual restrictions, Plaintiff's activities only partially contradict Dr. Carpenter's assessment.  The amount of driving undermines Dr. Carpenter's assessment about the effects of her vertigo or headaches and her need to lie down.  While she does not drive at night, she does

_____

outright rejected Dr. Carpenter's limitations, I cannot assess whether the RFC adequately accounts for the vision limitations the ALJ improperly rejected.

drive in the daytime.  It was reasonable for the ALJ to conclude that someone who experiences

disabling-level vertigo would not drive, even during the day.  Plaintiff's computer use is limited,

but she does use it for twenty to forty minutes at a time.  To the extent Dr. Carpenter's opinion is

understood as completely precluding computer use, Plaintiff's computer activity is inconsistent

with that opinion.[3]  But, to the extent the opinion offers restrictions accommodating some limited

reading or computer use, it is consistent with Plaintiff's activities.  Finally, it is unclear why the

ALJ found that Plaintiff's ability to cook or watch television occasionally to be inconsistent with

Dr. Carpenter's "close vision" visual restrictions.  Neither activity requires reading, computer use,

or close vision.  Thus, these activities do not undermine Dr. Carpenter's visual restrictions.

In summary, the ALJ's rejection of Dr. Carpenter's opinion is only partially supported by

substantial evidence in the record.  The ALJ did not err in rejecting the opinion regarding

standing and walking limitations.  However, the ALJ erred in rejecting Dr. Carpenter's

limitations on the use of her right hand and on the "close vision" task limitations.

III.  Past Relevant Work

At step four, the ALJ determined that Plaintiff could return to her past relevant work as a

receptionist.  Tr. 57-58.  During the hearing, a vocational expert (VE) testified that Plaintiff's past

relevant work as a receptionist was a sedentary position with a Dictionary of Occupational Titles

(DOT) code of 237.367-038.  Id.  It has a Significant Vocational Preparation (SVP) level of 4.

---

[3]  Dr. Carpenter opined that Plaintiff "should not read, look at a computer screen, or do
other tasks which require close vision," suggesting that she is completely limited in those
activities.  But, he also said that "these activities should be followed by a break of at least 20
minutes[,]" suggesting that he anticipated she might engage in those activities.  The opinion is
not entirely clear as to the extent of the limitation for reading, computer screen use, or close
vision tasks.

Id.  Based on a hypothetical including all the limitations the ALJ provided in his RFC, the VE testified that Plaintiff could perform her prior work as a receptionist, as it is described in the DOT.  Tr. 107-09.  Relying on that testimony, the ALJ concluded that with his RFC, Plaintiff could perform the receptionist position as generally performed.  Tr. 58.

Plaintiff argues that the ALJ erred in two ways:  (1) the ALJ improperly classified the receptionist job by its least demanding function; and (2) the receptionist job is inconsistent with the RFC.

A.  Prior Receptionist Job as Actually Performed - Least Demanding Function

Plaintiff's prior receptionist job involved a combination of receptionist tasks and patient care tasks.  Tr. 112, 505, 508.  Because she was a receptionist at an orthopedic doctor clinic, she performed typical reception-type tasks such as answering the phone, greeting patients, creating patient charts, calling doctors, etc. Tr. 508.  But, she also occasionally assisted doctors or x-ray technicians in moving or transferring patients.  Id.  The latter task, which could involve lifting 100 pounds or more, occurred one to two times per week.  Id.

The VE testified that the receptionist job was sedentary, meaning it requires lifting no more than ten pounds at a time.  20 C.F.R. § 404.1567(a).  Plaintiff argues that by finding her able to return to the receptionist job, the ALJ improperly found her able to perform only the least demanding aspects of her prior job (the reception-type tasks) which conflicts with Ninth Circuit law.

In a 1985 case, the Ninth Circuit explained that "[e]very occupation consists of a myriad of tasks, each involving different degrees of physical exertion."  Valencia v. Heckler, 751 F.2d 1082, 1086 (9th Cir. 1985).  The court held that classifying a claimant's past relevant work

"according to the least demanding function of the claimant's past occupations is contrary to the letter and spirit of the Social Security Act." Id. Thus, in Valencia, it was error to conclude that the plaintiff's past relevant work was "light" simply because while performing the "medium" job of agricultural laborer, she sometimes engaged in the "light" task of tomato sorter. Id. at 1086-87; see also Vertigan v. Halter, 260 F.3d 1044 (9th Cir. 2001) (ALJ erred by categorizing the claimant's past work as a "cashier" when she was actually a "pharmacy clerk" and cashier work was only a "small part of her job.").

Relying on Valencia, Plaintiff argues that the ALJ erred by concluding that Plaintiff could return to only the reception-task part of her prior receptionist job. Because Plaintiff's job involved both reception duties and heavy lifting tasks such as moving and positioning patients, it has no corresponding job title in the DOT. As such, Plaintiff argues, the ALJ improperly concluded that she could perform the job based only on the least demanding receptionist tasks. According to Plaintiff, this is inconsistent with Valencia and subsequent cases.

A very recent Ninth Circuit case shows that Valencia is distinguishable and does not support Plaintiff here. In Stacy v. Colvin, 825 F.3d 563 (9th Cir. 2016), the court addressed an almost identical fact situation as presented here. The plaintiff had prior relevant work as a "stationary engineer." Id. at 566-67. At plaintiff's first hearing, the VE classified this work as a "working supervisor" with a heavy exertional level which the plaintiff could not perform. Id. at 506. At a subsequent hearing after remand, new testimony by the plaintiff established that seventy to seventy-five percent of his prior "stationary engineer" work was supervisory. Id. at 567. Based on this new evidence, the ALJ asked the VE if the plaintiff could perform his past relevant work. Id. In response, the VE testified that "[a]s he performed the stationary engineer,

no.  As a stationary engineer supervisor, yes."  With that, the ALJ denied benefits at step four,

concluding that the plaintiff could perform his past relevant work of "stationary engineer

supervisor" as that job is generally performed in the national economy.  Id.

      The district court affirmed the ALJ.  On appeal to the Ninth Circuit, the plaintiff argued

that the ALJ erred by classifying his former work based on the least demanding aspect of the job

which was supervising.  Id. at 569.  That is the same argument Plaintiff makes here.  The court

rejected the argument.  First, the court explained that ALJs may use either the "actually

performed test" or the "generally performed test" when evaluating a claimant's ability to perform

past relevant work.  Id.  The "generally performed test" applies in "situations where a claimant's

past job was especially demanding when compared with industry standards."  Id.

      The court recognized that regardless of whether the "actually performed test" or the

"generally performed test" is applied at step four, the "ALJ may not classify a past occupation

according to the least demanding function."  Id. (internal quotation marks omitted).  The court

discussed Valencia and similar cases, noting that in all of them, the "'least demanding aspect' of

the claimant's past job was something the claimant did less than half the time[.]"  Id. at 570.  In

each case, the ALJ erred by "equating that one task with a full time job."  Id.

      The Stacy court rejected the plaintiff's argument that Valencia controlled.  It

acknowledged that "[r]econciling the 'generally performed' test with the Valencia line of cases is

difficult but not impossible."  Id.  It concluded that "Valencia and its progeny do not apply"

where "(1) the 'least demanding function' is a task that the claimant actually performed most of

the time; and (2) the DOT defines the claimant's past job as requiring only that least demanding

function."  Id.  In Stacy, both of those criteria were met.  The DOT classified the plaintiff's past

job as supervisory and the record showed he mostly performed supervisory tasks in the job,

which he testified was seventy to seventy-five percent of the time.  Id.  The court explained:

"The fact that his employer also required him to occasionally do other, non-supervisory tasks

does not change the fundamental nature of his work."  Id.  Thus, the case was distinguishable

from Valencia and similar cases where the claimants performed less-demanding tasks only

occasionally.

      Like the plaintiff in Stacy, Plaintiff herself described the lifting and positioning of

patients as an "occasional" task she performed only one to two times per week.  Thus, she

performed the "least demanding function" of the job, meaning the receptionist tasks, the vast

majority of the time.  And, the DOT definition of her prior position requires nothing more than

the least demanding function of receptionist duties.  See DOT, 237.367-038, available at 1991

WL 672192 (classifying receptionist as sedentary and listing duties such as "[r]eceives callers at

establishment, determines nature of business, and directs callers to destination[;] [o]btains

caller's name and arranges for appointment with person called upon[;] [d]irects caller to

destination and records name, time of call, nature of business, and person called upon").

      The ALJ's conclusion that Plaintiff can perform her past relevant work as a receptionist,

as the job is generally performed, was not inconsistent with Valencia.

      B.     Prior Receptionist Job - Inconsistent with RFC Limitation to Simple, Detailed,
            Non-Complex Tasks

      In pertinent part, the ALJ's RFC limited Plaintiff to the performance of "simple and

detailed tasks," and excluded "complex tasks."  Tr. 50.  The receptionist job that the ALJ

concluded Plaintiff could perform carries an SVP of 4 and a General Educational Development

(GED) reasoning level of three.  DOT, 237.367-038, available at 1991 WL 672192.  Plaintiff

argues that a job with these requirements is incompatible with the ALJ's RFC restrictions to

simple and detailed but no complex tasks.  I agree with Plaintiff.

"Courts in this district have previously recognized that a job's simplicity level is better

addressed by its GED (reasoning level) ratings, rather than by its SVP rating."  Smith v. Colvin,

No. 3:14-cv-01210-PA, 2016 WL 680535, at *11 (D. Or. Feb. 19, 2016).  GED levels are

"aspects of education (formal and informal) . . . required of the work for satisfactory job

performance."  DOT, App. C, § 3, 1991 WL 688702.  GED levels include the reasoning ability

required to perform the job.  They range from Level One to Level Six.  Id.

Plaintiff relies on Zavalin v. Colvin, 778 F.3d 842 (9th Cir. 2015) to support her

argument.  I agree with Defendant that Zavalin is not controlling.  But, it is instructive.  In that

case, the court held that Level Three reasoning is "at odds" with a limitation to simple, routine

tasks.  Id. at 847 (holding that "there is an apparent conflict between the [RFC] to perform

simple, repetitive tasks, and the demands of Level 3 reasoning").  As the court explained, Level

Three reasoning requires the claimant to "'[a]pply commonsense understanding to carry out

instructions furnished in written, oral, or diagrammatic form.  Deal with problems having several

concrete variables in or from standardized situations.'" Id. (quoting DOT, App. C, §3 1991 WL

688702).

The court concluded that the claimant's limitation to "simple, routine tasks," and "simple,

repetitive" tasks was inconsistent with the Level Three requirements because "it may be difficult

for a person limited to simple, repetitive tasks to follow instructions in 'diagrammatic form' as

such instructions can be abstract."  Zavalin, 778 F.3d at 847 (internal quotation marks omitted).

29 - OPINION & ORDER

Instead, when the definitions of Level Three reasoning and Level Two reasoning were compared "side-by-side," it was apparent that Level Two reasoning was more consistent with the RFC's limitations.  Id. (noting that Level Two reasoning requires the claimant to "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions.  Deal with problems involving a few concrete variables in or from standardized situations.").

Zavalin is distinguishable because here, the RFC does not limit Plaintiff to simple and routine or simple and repetitive tasks.  Instead, the RFC expressly provides for the performance of simple and detailed, but not complex, tasks.  Nonetheless, Zavalin shows that looking at the language used to define the GED reasoning levels is essential.

A Ninth Circuit decision issued several months after Zavalin resolved a similar issue also by examining the actual language of the GED reasoning level definitions.  Rounds v. Comm'r, 807 F.3d 996, 1003 (9th Cir. 2015).  In Rounds, the claimant was limited to "one to two step tasks."  Id. at 1001.  The ALJ concluded the claimant was not disabled because she could perform at least three other jobs, all of which had a Level Two GED reasoning.  Id. at 1002.  The court concluded that the limitation was in conflict with the required reasoning level.  Id. at 1003.  It reached its conclusion by examining the language of the reasoning level definitions and noting that the "conflict between [the claimant's] RFC and Level Two reasoning is brought into relief by the close similarity between [the claimant's] RFC and *Level One* reasoning."  Id.  Level One reasoning includes the ability to apply "commonsense understanding to carry out one- or two-step instructions."  Id.  The court noted that the similarity was "obvious."  Id.  It rejected the defendant's argument that the RFC and Level One definition were dissimilar because the DOT referred to "instructions" while the RFC limitation was to "tasks."  Id.  The court also noted in a

30 - OPINION & ORDER

footnote that unpublished circuit panel decisions had concluded that an RFC limitation to

"'simple' or 'repetitive' tasks" is consistent with Level Two reasoning. Id. at 1004 n.6 (emphasis

added; citing unpublished decisions from the Third, Eighth, Ninth, and Tenth Circuits).

      Level Two reasoning requires the claimant to "[a]pply commonsense understanding to

carry out detailed but uninvolved written or oral instructions" and to "[d]eal with problems

involving a few concrete variables in or from standardized situations." DOT, App. C., § 3, 1991

WL 688702. In a 2013 case, I considered the issue of whether a limitation to "simple, routine

tasks and instructions" was consistent with GED Level Two reasoning. Patton v. Astrue, No.

6:11-cv-06423-ST, 2013 WL 705909, at *1 (D. Or. Feb. 25, 2013). In concluding that the

limitation was consistent, I disagreed with cases that found the presence of the word "detailed" in

the Level Two definition to be inconsistent with a limitation to simple instructions. Id. I

explained that the word "detailed" was modified by the word "uninvolved." Id. Further, and as

relevant here, I concluded that "uninvolved" meant "simple." Id. I explained that the entire

phrase "detailed but uninvolved" allowed for instructions that may be both detailed and simple.

Id. That is, "[a] task that includes 'detailed, but uninvolved' instructions may consist of a number

of steps, none of which are complex." Id.

      Given Patton's construction of the Level Two definition, it is obvious, just as it was in

Zavadin, that Level Two GED reasoning is consistent with the RFC in this case. The ALJ

restricted Plaintiff to simple, detailed, non-complex tasks. Level Two allows for the performance

of detailed but simple instructions which are not complex. As in Rounds, the fact that the DOT

refers to tasks and the RFC refers to instructions is immaterial. Further, as in Zavadin, a person

limited to simple tasks, even those that are detailed, may have difficulty following instructions in

31 - OPINION & ORDER

a "diagrammatic form" given that they can abstract.  As a few other courts around the country have concluded in similar cases, when the RFC is compared to the definitions of both Level Two and Level Three reasoning, it is clear that the RFC here aligns with Level Two and not Level Three.  See Davis v. Astrue, No. 3-06-CV-883-B, 2008 WL 517238, at *5 (N.D. Tex. Feb. 27, 2008) (ALJ erred by finding that claimant with limitation to "simple or detailed instructions" could perform job with Level Three reasoning); Trebilcock v. Barnhart, No. 04-18-P-S, 2004 WL 2378856, at *3 (D. Me. Oct. 25, 2004) (limitation to "no more than simple instructions, occasionally detailed, not complex" inconsistent with Level Three GED reasoning; "a person capable of carrying out even 'occasionally detailed' instructions seeming incapable of performing a job with a GED reasoning level of 3"; further noting in *dicta* that a person limited to only "occasionally detailed" non-complex instructions could even be incapable of performing a job with Level Two GED); Hodgson v. Barnhart, No. 03-185-B-W, 2004 WL 1529264, at *2 (D. Me. June 24, 2004) (limitation to "simple instructions, occasionally detailed but not complex," might be consistent with Level One or Two reasoning but  was inconsistent with Level Three reasoning); report and recommendation adopted, No. CIV. 03-185-B-W, 2004 WL 1770148 (D. Me. Aug. 4, 2004),  aff'd, 129 F. App'x 633 (1st Cir. 2005).

The ALJ is required to ask the VE on the record if the evidence the VE has provided conflicts with the DOT.  SSR 00-4p, 2000 WL 1898704, at *2, *4. When there is an "apparent unresolved conflict" between the VE evidence and the DOT, the ALJ has a duty to elicit a reasonable explanation for the conflict before relying on the VE's evidence.  Id.; see also Zavalin, 778 F.3d at 846 ("When there is an apparent conflict between the vocational expert's testimony and the DOT . . . the ALJ is required to reconcile the inconsistency").

Here, the ALJ asked the VE if his testimony was consistent with the DOT.  Tr. 112.  The VE testified it was.  Id.  However, given the apparent conflict between the RFC limitations and the Level Three reasoning required by the receptionist position the ALJ found Plaintiff was able to perform, the ALJ was required to elicit an explanation for the conflict before relying on the VE's evidence.  This the ALJ did not do and thus, his error in finding that Plaintiff could perform the receptionist position with a Level Three GED reasoning category, was not harmless.[4]

IV.  Remand

Because the ALJ made errors, remand is appropriate.  Plaintiff argues for an award of benefits upon remand.  Plaintiff contends that benefits are appropriate because when Dr. Carpenter's opinion is fully credited, disability is established and there are no outstanding issues requiring resolution.  But, as explained above, the ALJ erred in rejecting some of Dr. Carpenter's opinion, but not all of it.  Thus, there is no basis for fully crediting his opinion.  As a result, there are, in fact, outstanding issues that must be resolved, such as considering a new RFC based on the portions of Dr. Carpenter' opinion which were improperly discounted and obtaining further VE testimony regarding jobs that Plaintiff can perform, before a determination of disability can be made.  Remand for additional proceedings is required.

/ / /

/ / /

/ / /

/ / /

---

[4]  Given my conclusion, I do not discuss Plaintiff's additional argument that the SVP 4 categorization of the receptionist position is also inconsistent with the RFC.

33 - OPINION & ORDER

CONCLUSION

The Commissioner's decision is reversed and remanded for additional proceedings.

IT IS SO ORDERED.

Dated this _____ 5 _____ day of _____ January _____, 2017

Marco A. Hernandez
United States District Judge

34 - OPINION & ORDER